Sneed, J.,
delivered the opinion of the Court.
Upon a motion to retax the costs in this case in the Circuit Court of the" county of Robertson, the plaintiffs, who were the unsuccessful parties in the litigation, moved to strike out the State tax of five dollars and the county tax of a like amount, adjudged against them, upon the ground that the statute imposing a tax upon lawsuits is unconstitutional and void. The motion was disallowed, and the plaintiffs have appealed in error.
It is insisted that the tax in question is but the imposition of a burthen upon the right of the citizen to go into the courts to have his wrongs redressed and his rights vindicated, and that the statute which authorized the tax is an infraction of that section of our Bill of Rights which declares that “all courts shall *36 be open, and every man, for an injury done Mm in Ms lands, goods, person, or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial, or delay.” This section of our Bill of Rights is in substance identical with the great principle of English liberty granted by Magna Charta, and was borrowed from the twenty-ninth chapter of that celebrated instrument, which, in its original English version, was in the words following: “No person shall be taken or imprisoned or dis-seized from his freehold, or liberties or immunities, nor outlawed, nor exiled, nor in any manner destroyed, nor will we come upon him or send against him except by legal judgment of his peers, or the law of the land. We will sell or deny justice to none, nor put off right or justice.”
By ss. 8 and 17 of our Bill of Rights the great guarantees of popular liberty announced in this chapter of Magna Charta were recognized and adopted as a part of the fundamental law of this State, first by the Constitution of 1796, again by that of 1834, and again by that of 1870. By the fourth section of the tenth article of the Constitution of 1796, it is provided: “The Declaration of Rights hereto annexed is declared to. be a part of the Constitution of this State, and shall never be violated on any pretense whatever. And to guard against transgression of the high powers which we have delegated, we declare that everything in the Bill of Rights contained, and every other right not hereby delegated is excepted out of the general powers of government, and *37 shall forever remain inviolate.” Hay. & Cobb Rev., 406.
A provision of equal import is contained in each of our subsequent Constitutions, of 1834 and 1870.
The first statute imposing a tax upon litigation in this State was enacted within three years after the adoption of the Constitution of 1796, and by that statute it was provided that the several clerks and masters of the courts of equity, the clerks of the superior courts of law, and the clerks of the several county courts shall collect the following taxes for the use of the State, viz: on each suit in equity, five dollars and fifty cents; on each suit in the superior courts of law, one dollar and twenty-five cents; on each suit in a county court, sixty-two and a half cents; on each appeal from an inferior to a superior court, or waits of certiorari, one dollar; and the taxes in equity and suits at law shall be taxed in the execution when the suits are determined. Act 1799, ch. 30, s. 1. Hay. & Cobb’s Rev. 349. By the act of 1817, ch. 138, this act of 1799, eh. 30, was amended so as to require the several clerks of the circuit and county courts to collect the sum of one dollar on each suit commenced by original writ or attachment, and the same on every suit taken to the circuit court from the county court by appeal or certiorari; also, the sum of one dollar on each indictment or presentment, and the sum of fifty cents on each appeal or certiorari from before a justice of the peace, in addition to the tax already collected by law, which shall be taxed on execution as heretofore. Hay. & Cobb *38 Rev., 349; and by the act of 1827, ch. 49, upon a successful motion by the solicitor against the clerk or other collector of public taxes, a tax fee was allowed the solicitor, “in case it be collected of defendants.” Id., 362.
These several statutes authorizing a tax upon judicial proceedings were in full force and operation when the Convention of 1834 met and adopted the Constitution of that year, wherein it is declared that “all laws and ordinances now in force and use in this State, not inconsistent with this Constitution, shall continue in force and use until they shall expire, be altered or repealed by the Legislature.” Cons. 1834, Art. xi, s. 1. The Legislature which assembled next after the adoption of the Constitution o'f 1834, recognized and adopted these laws by re-enacting them,, with certain changes, in the words following: “ Each and every person who shall be unsuccessful -in any ’suit in equity shall pay a tax of two dollars and fifty cents; on each suit in the circuit court, two dollars- and twenty-five cents; on each appeal, writ of error or certiorari from the circuit or chancery courts to the-Supreme Court, two dollars; on each appeal or writ of certiorari from before a justice of the peace, one dollar and sixty-two and a half cents; and each indictment or presentment, one dollar.” Act of 1835, ch. 13, s. 4; Car. & Nich. Rev., 604. By a subsequent act these taxes were increased as follows: on each suit in law or equity, three dollars and fifty cents; on each petition filed in any of the courts of record for the division and distribution of estates, three dollars- *39 and fifty cents; on each appeal, writ of error or cer-tiorari from the circuit or chancery courts to the Supreme Court, three dollars and fifty cents; on each appeal or certiorari from before a justice of the peace, two dollars; and on each presentment or indictment, two dollars. Code, s. 553. And by s. 551 it is provided that the taxes aforesaid shall be paid by the unsucessful party in the litigation, and in prosecutions for offenses against the criminal laws by the party taxed with the costs. By the act of 1865, ch. 8, these laws were again remodeled, and the tax on each original suit in any of the courts of law or equity fixed at five dollars. And such was the state of the law upon this subject when the Convention met in 1870 to reorganize the State government, and when the Constitution of that year was adopted and proclaimed.
■ By the first section of the eleventh article oí that instrument, it is ordained that all laws and ordinances now in force and use in this State, not inconsistent with this Constitution, shall continue in force and use until they shall expire, or be altered or repealed by the Legislature. ¥e have thus been careful to show the state of the law upon this subject from the foundation of the government to the present hour, and to trace the changes of the organic law, that it may be seen that on at least two memorable occasions in the history of this Commonwealth, the people have met in convention, having similar laws upon the statute book, some of which are as old as the State itself, and have reorganized their government without any ordinance or *40 provision which, in express terms, abrogates or reprobates this kind of legislation. While, therefore, we can not assume that the provisions of the two Constitutions of 1834 and 1870, adopting and approving the laws then in force, so far as they are not inconsistent with those instruments, give the constitutional sanction to these statutes; yet we must hold these facts to be a persuasive argument wdiich tends to invite, if not to justify, such an assumption.
It has been well stated at the bar that time can not consecrate a wrong, and that a statute which violates the organic law, though it has been acquiesced in as of unquestioned validity for generations, is not the less an iniquity on account of its years. It therefore becomes us to inquire, without reference to the antiquity of these laws, and to the circumstances referred to, which would seem to have forestalled this investigation, whether they are in fact repugnant to the provisions of the Constitution, that “the courts shall be open, and every one, for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial, or delay.” It may be observed at the threshold, that a relinquishment of the right of taxation is not to be presumed unless expressed in terms too plain to be mistaken. Jefferson Branch Bank v. Shelly, 1 Black R., 436; Oilman v. Sheboygan, 2 Id., 510; Phil, and Wilmington R. R. Co. v. Maryland, 10 How., 376. The power to tax in a government involves its power to exist. It is the chief and fundamental attribute of sovereignty, *41 and the objects and sources of taxation are, in general, bounded only by the jurisdictional or territorial limits of. the State, and extend to and embrace all privileges, rights, properties, and franchises not exempted in the organic law. It is the condition of citizenship that the enjoyment of all these shall be protected by the government, if the citizen will pay tribute upon them for his own and the general weal. Thus, said Chancellor Kent, the power of State taxation is to be measured by the extent of State sovereignty, and this leaves to a State the command of all its resources, and the unimpaired power of taxing the people and property of the State. 1 Kent Com., 461. The power of taxation, said Marshall, C. J., is an original principle, which has its foundation' in society itself. It is granted by all for the benefit of all. It resides in the government as part of itself. * * * However absolute the right of any individual may be, it is still in the nature of that right that it must bear a portion of the public burdens, and that portion must be determined by the Legislature.
This vital power may be abused; but the interest, wisdom, and justice of the representative body, and its relation to its constituents, furnish the only security against excessive as well as against unwise taxation. And it is said to be unfit for the judicial department to inquire what degree of taxation is the legitimate one, and what degree may amount to an abuse of the power: Vide McCulloch v. Maryland, 4 Wheat, 428, 430; Providence Bank v. Billings, 4 Pet., 561. And so it is said in another ease: “If *42 the right to impose a tax exists, it is a right in its nature acknowledging no limit. It may be carried to any extent within the jurisdiction of the' State which imposes it which the will of such State may prescribe.-” Weston v. Charleston, 2 Pet., 449; Bank of Commerce v. New York City, 2 Black, 631. It was an observation of Lord Bacon, “that no people overcharged with tribute are fit for empire.” And yet the power of taxation in a State could not well be circumscribed without peril to the State itself. It being, therefore, the unquestionable right of every government to tax everything, and to tax without limit, unless the limitation be imposed by the organic law, we must look to the latter, to find the restrictions, if any, imposed in this respect upon the legislative department here.
We have seen that the laws authorizing a tax upon law suits, to be paid by the unsuccessful party, had their origin soon after the organization of the State government under the Constitution of 1796, and having existed ever since, they have passed the ordeal of two constitutions without express repudiation or disapproval. And it would seem remarkable that a law enforced almost every day in some part of the State, for more than seventy years, and which has brought its thousands and hundreds of thousands of revenue into the State and county treasuries, should have been suffered so long, sub silentio, to oppress the citizens, if it be, indeed, repugnant to the Constitution. And it would seem yet more strange that in the two conventions which sat to deliberate upon this important ques *43 tion, with these laws before them, the subject of exemptions should have engaged the attention of both, and yet that the whole instrument should be silent upon this subject. We find on the other hand that all property, real, personal and mixed, and all privileges, shall be taxed, without other restriction than that taxes shall be equal and uniform; that only certain property held by the State, or cities, or towns, and used exclusively for public purposes, and such as may be held and used for purposes purely religious, charitable, scientific, literary, or educational, may be exempt, and that by the terms of the Constitution only one thousand dollars worth of personalty in the hands of each tax-payer, and the direct products of the soil in the hands of the producer, or his vendee, shall be exempt from taxation.
These two latter, of all the vast resources of the State, are alone expressly exempted from taxation by the terms of the Constitution itself. And among the few which may be exempted, at the option of the Legislature, the subject of this present inquiry does not appear. If it be true then that the laws imposing a tax upon law suits are incompatible with the seventeenth section of the Bill of Rights, there must be some marvellous obscurity in that section, since it has escaped the scrutiny of two conventions, and the vigilance of two generations not distinguished for their indifference to their constitutional rights. We are free to confess that the able and ingenious arguments submitted at the bar upon this question, on behalf of the plaintiffs, had for a time generated doubts and *44 difficulties to wliich we were strangers before; but we imagine that these doubts will disappear as this subject is more thoroughly investigated. If we are correct in assuming that the power of taxation in a government is unlimited except by the organic law, then he right of entering the courts for the purpose of litigation, whether considered as a species of property, a franchise, or a privilege, is one that can not escape this all-pervading power. Whether a law is void for repugnancy to the Constitution, is at all times a question of delicacy, which ought seldom, if ever, to be decided in the affirmative in a doubtful case. The opposition between the Constitution and the law should be such that the Judge feels a clear and strong conviction of their incompatibility with each other: Potter’s Dwarr. 65; 6 Cranch, 128.
The right to litigate in the courts is a common right, and therefore it cannot be said to be taxable as a privilege. A privilege, in the sense of our revenue laws, is “a power granted to an individual or corporation to do something, or to enjoy some advantage which is not of common right:” 2 Meigs Dig., s. 1587; or, in' the language of this Court, it is a license, or permission to do that which in general is prohibited: Mabry v. Turner, 1 Hum., 94, 98. But the right to litigate one’s rights in the courts is a species of property — an incorporeal property — and all property is taxable in this State.
Property is corporeal or incorporeal. The first, it is said, comprehends such as is perceptible to the senses, as lands, houses, goods, merchandise, and the *45 like; the latter consists in legal rights, as choses in action, easements, and the like: 2 Bouv. L. D., 387. But it is said that, in the words of Marshal, C. J., the power to tax involves the power to destroy, and if the Legislature can tax the law suit at all, they may tax it so heavily as to render the right itself nugatory and of no avail. To this we reply in the words of the same eminent jurist, that the power of taxing the people and their property, is essential to the very existence of government, and may be legitimately exercised on the objects to which it is applicable, to the utsmost extent to which the government may choose to carry it. The only security against the abuse of this power is found in the structure of the government itself.
In imposing a tax, the Legislature act upon their constituents. This is, in general, a sufficient security against oppression and erroneous taxation: McCulloch v. Maryland, 4 Wheat, 428. But it will be insisted that the courts shall be open, and every man, for an injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law, and right and justice without sale, denial, or delay. The promise is not to the man who deals unjustly, who builds his house by unrighteousness, and who defrauds and wrongs his neighbor, but to him who has been injured in his lands, goods, or reputation.
The tax is imposed on the “unsuccessful party,” who, in the opinion of the tribunal adjudicating the case, is in the wrong — who has not been injured in his “lands, goods or reputation,” but who has wronged his adversary *46 —and it becomes, therefore, in this view, not a tax upon the judicial remedy, but a tax upon unrighteous litigation. If, indeed, the tax were upon the plaintiff as a condition precedent to his litigating his right in court; yet no tax could amount to an inhibition upon him, as we have our actions in forma pauperis, with one or two exceptions, as a remedy in all conceivable cases. The clause of the Constitution now under consideration was, to some extent, considered and expounded in an early case in this Court, in which it was said, we must understand the meaning to be, that notwithstanding any act of the Legislature to the contrary, every man shall have right and justice without sale, denial or delay.
That is to say, for the attainment of justice — the end of law — right must be administered without sale. Original process must issue without price, except what the law fixes, and without denial, though the defendant be a favorite of the King who interferes in his behalf, and must be proceeded on by judges, after suit instituted upon it, without delay, either of themselves or by order of the King, or as we say, act of the Legislature. And the judges where the cause depends must issue the proper judicial process without fee or reward, except that fixed by law. This, say the Court, is the long fixed, well-known meaning and legal construction of the words right and justice, without sale, denial, or delay. Townsend v. Townsend, Peck R. 1, 15, citing 2 Inst. 55, 56; 1 Meigs’ Dig., s. 521. It is in our opinion clear that the law may impose terms upon the right of litigation, provided the *47 same be uniform and in the shape of a public tax for the general benefit without a violation of the letter or spirit of the seventeenth section referred to. It is said by an ancient law-writer of England that so much of the twenty-ninth chapter of Magna Charta, as makes King John assert that he will sell or deny justice to none, nor put off right or justice, was extorted from the monarch because it was usual to pay fines anciently for delaying law proceedings. This sometimes was extended to the defendant’s life. Sometimes fines were paid to expedite process and to obtain right. And in some cases the parties litigant offered part of what they were to recover to the crown. Many instances of fines are mentioned for the King’s favor, and there is a particular instance of the Dean of London paying twenty marks as a fine to the King, that he might assist him against the Bishop in a law suit. Observe Mag. Chart. 21.
The courts of law were not in those times open courts, says the same author, as they are now understood to be. An open court at present (1766) is generally so crowded with spectators that no one who hath any real business to do can have access; or if he procure access, he is not so so much at his ease as those whose interests are depending have a reasonable right to insist upon. The old law required that the plaintiff or defendant should pay nothing, but that the idle part of the audience should pay one penny each for admittance, which may be nearly equal to a shilling at present, when the servants of judges at the old Bailey, and the officers of the courts in West- *48 minister Hall, have upon certain occasions taken not only a penny from the spectators, hut even insisted on gold. Are they not within the letter- and the spirit of the law ? asks this quaint old expounder, and is it not incumbent on the judges to put it in ' execution agreeable to what is enjoined? Id. 102. These little circumstances, says he, show strongly that to the “ manners of the times,” we are undoubtedly indebted for that great principle of Magna Chart-a; which forbids the sale, denial or delay of justice, and not the just and legitimate exercise of the taxing power, which is for the benefit of all, and not for the exclusive behoof of the servants of judges at the old Bailey or the officers of the court in Westminister Hall. The object and purview. of this celebrated chapter of Magna Charta are therefore best interpreted by the “ manners of the times,” which led the barons to demand it. Thus we are told by the historian that “the ancient Kings of England put themselves entirely on the footing of the barbarous eastern princes, whom no man must approach without a present; who sell all their good offices, and who intrude themselves into every business that they may have a pretext for extorting money. Even justice was avowedly bought and sold; the King’s court itselfj though the supreme judicature of the Kingdom, was open to none that brought not presents to the King; the bribes given for the expediture, delay, suspension, and doubtless for the perversion of justice, were entered in the public registers of the royal revenue, and remain as monuments of the perpetual iniquity and tyranny of the times.
*49 The Barons of the Exchequer, for instance, the first nobility of the kingdom, were not ashamed to insert as an article in their records that “the County of Norfolk paid a sum that they might be fairly dealt with; the Borough of Yarmouth, that the King’s charter which they have for their liberties, might not be violated; Richard, son of Gilbert, for the King’s helping him to recover his debt from the Jews; another that he might be permitted to make his defense in case he were accused of a certain homicide; another still, for free law if accused of wounding another; and another for having an inquest to find whether certain parties .were accused of murder out of ill will or for just cause.” These are a few of a great number of like instances preserved in the ancient rolls of the Exchequer: 1 Hume Hist. Eng., 504. These are the sales, delays and denials of justice, which influenced the Barons, in the words of the historian, “to take an oath before the high altar to adhere to each other, to insist on their demands and to make endless war on the King till he should submit to grant them.” Id,., 462.
We apprehend that in the three conventions of Tennessee the idea of taxation was never for a moment considered in connection with the seventeenth section of the Bill of Rights. As it was official plunder and not taxation which gave it birth in Magna Charta, so it was ordained as a part of our own organic law, in the light of history, not to circumscribe this high attribute of sovereignty, but to elevate the standard of judicial morals, to purify the fountains of *50 justice and warrant forever the right of the injured citizen to enter the courts and demand his rights upon such terms, applicable to all alike, as the law may prescribe for the general good.
Let the judgment be affirmed.